COLORADO COURT OF APPEALS                                    2017COA75

Court of Appeals No. 13CA1516
Arapahoe County District Court Nos. 11CR1503 & 12CR1029
Honorable Kurt A. Horton, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Matthew Wayne George,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE WEBB
Bernard and Dunn, JJ., concur

Announced June 1, 2017

Cynthia H. Coffman, Attorney General, Rebecca A. Adams, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Karen M. Gerash, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    If a police officer conducts a warrantless search based on consent — but a court suppresses evidence obtained because the consent was invalid — does the law of the case doctrine prevent the officer from lawfully obtaining the same evidence by applying to a different judge for a search warrant, this time based on grounds other than consent, and without using the fruits of the earlier unlawful search in the application?  If not, does the officer forfeit that opportunity by failing to tell the second judge about the earlier suppression order?  These are novel questions in Colorado and have been addressed infrequently elsewhere.

¶ 2    A jury convicted Matthew Wayne George of multiple offenses arising from his sexual contact with two young girls whom he met on the Internet.  On appeal, he asserts two errors:

- data obtained by forensically examining a GPS device police found in his car after conducting a warrantless search based on third-party consent should have been suppressed, despite later issuance of a warrant to search the device; and

- the cases involving the two victims, which had been separately charged, were improperly joined for trial.

1

The Attorney General concedes that George preserved both issues for appeal.

¶ 3     We reject George's law of the case and forfeiture arguments, conclude that the GPS evidence was admissible because the warrant represented an independent source, and further conclude that the trial court did not abuse its discretion in joining the cases. Therefore, we affirm.

## I.  Background

¶ 4     According to the prosecution's evidence, George met then fourteen-year-old A.R. on an Internet dating website.  She testified to several sexual encounters with him at various locations, some of which involved force.  Later that year, then twelve-year-old G.D. also met George on a dating website.  She testified about a sexual encounter with him in his car.  The victims were strangers.

¶ 5     George admitted having met the victims on the Internet but challenged their credibility as to any sexual contact having occurred.  He did not testify.

## II. The Trial Court Did Not Err in Denying George's Motion to Suppress the Fruits of a Second Search of his GPS Device

¶ 6    Following George's arrest and inability to post bond, he was evicted from his apartment. Then the landlord had George's car towed from the premises. The towing company kept the car at its impound lot. The lead investigator obtained the towing company's consent to search the car.

¶ 7    In it, he found a GPS device. Instead of seeking a warrant to search the device, the investigator obtained the company's consent to examine it. Data obtained from a forensic examination showed movements generally consistent with the victims' testimony about their meetings with George.

¶ 8    George moved to suppress, challenging both the search of his car and the examination of the GPS device. The trial court ruled that the towing company's consent to search the car was valid[1] but that its consent to search the GPS device was not. The court also rejected the prosecution's argument that the investigator conducted the search in good faith. It suppressed evidence obtained from examination of the device.

---

[1] George has not appealed this ruling.

¶ 9    But the story does not end here.  Rather than appealing the suppression order under section 16-12-102(1), C.R.S. 2016, the prosecution directed the investigator to seek a search warrant for the GPS device — which remained in police custody — from a different magistrate.  The investigator did not specifically refer to any data obtained from examination of the GPS device in the warrant application.  Nor did he disclose the earlier suppression ruling.  After the warrant was issued, the investigator had the device forensically reexamined, apparently yielding the same results.

¶ 10   To no one's surprise, George again moved to suppress.  He argued that under the law of the case doctrine, the prosecution could not dodge the prior suppression ruling by belatedly seeking a search warrant.  The prosecution responded that the warrant triggered the independent source doctrine.  The prosecution also requested the court to reconsider its earlier ruling on consent.  George replied that because the fruits of the unlawful search had been used in the warrant application — and even if not, had motivated the investigator to seek the warrant — the second search was not truly independent.

¶ 11      The court held a hearing.  The investigator testified that had

the towing company not given consent based on asserted ownership

of the car and its contents, including the GPS device, he would have

sought a search warrant.  E-mails predating the consent search

corroborated this testimony.  He also testified that the warrant

application did not refer to the fruits of the initial examination of

the device, but did include background information from a report

that he had prepared following the consent search.

¶ 12      The trial court declined to reconsider its earlier suppression

ruling.  Then the court denied the motion to suppress based on the

independent source doctrine.  In doing so, it found that the decision

to seek the warrant had not been based on the fruits of the initial

unlawful search and information from that search had not been

presented to the magistrate as a basis for seeking the warrant.

## A.  Standard of Review and Law

¶ 13      Four familiar principles provide a legal framework.

¶ 14      First, review of a trial court's suppression order presents a

mixed question of fact and law.  *People v. Hyde*, 2017 CO 24, ¶ 9.  A

reviewing court defers to the trial court's findings of fact that are

supported by the record, but it assesses the ultimate legal effect of those facts de novo. *Id.*

¶ 15 Second, the exclusionary rule is a judicially created remedy designed primarily to deter unlawful searches and seizures by law enforcement officials. *People v. Morley*, 4 P.3d 1078, 1080 (Colo. 2000). Under this rule, "evidence obtained in violation of the Fourth Amendment and article II, section 7 of the Colorado Constitution" must usually be suppressed. *Id.*

¶ 16 Third, the independent source doctrine is an exception to the exclusionary rule. According to this doctrine, "the unconstitutionally obtained evidence may be admitted if the prosecution can establish that it was also discovered by means independent of the illegality." *Id.* (quoting *People v. Schoondermark*, 759 P.2d 715, 718 (Colo. 1988)). It applies "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one." *Id.* at 1081 (alteration in original) (quoting *Schoondermark*, 759 P.2d at 719). Like a suppression order, this doctrine presents a mixed question of fact and law. *See People v. Cruse*, 58 P.3d 1114, 1120 (Colo. App. 2002).

¶ 17    Fourth, another exception may arise "when, despite an otherwise invalid warrant, a trial court nonetheless admits evidence because the officer(s) that executed the warrant had a reasonable good faith belief that the search was in accord with the Fourth Amendment." *People v. Cooper*, 2016 CO 73, ¶ 10. "Colorado codified the good faith exception to the exclusionary rule at section 16-3-308(4), C.R.S. (2016)." *Id.* at ¶ 11.

### B.  Application

#### 1.  The Legality of the Initial Search is Not Properly Before Us

¶ 18    We begin with the Attorney General's argument that the data obtained from the initial warrantless search of the GPS device should not have been suppressed because the search was conducted in good faith.  Were we to agree, the validity of the second search would be moot, ending further analysis.

¶ 19    According to the answer brief, "it was reasonable for the investigator to believe that the manager of the towing company had the authority to consent to the search."  The answer brief goes on to assert that the Attorney General "may defend the trial court's denial of a motion to suppress on any ground supported by the record." *See People v. Aarness,* 150 P.3d 1271, 1277 (Colo. 2006) ("On

7

appeal, a party may defend the trial court's judgment on any ground supported by the record, whether relied upon or even considered by the trial court.").

¶ 20 George responds that we should not address this argument because it was "litigated and rejected" by the trial court in granting the first suppression motion and the prosecution failed to seek interlocutory review of that ruling under section 16-12-102(2). We agree with George, although for a somewhat different reason.

¶ 21 True enough, "even if a consenting third party lacks actual authority, if a police officer reasonably believes that such third party has authority to consent to a search, the search is not unconstitutional." *People v. Upshur*, 923 P.2d 284, 287 (Colo. App. 1996). But in the first suppression hearing, the trial court rejected this very argument:

> When it became apparent there was
> uncertainty as to . . . legal authority to consent
> to a search of the GPS . . . the investigator
> could and should have consulted legal counsel
> or simply requested a warrant from a
> disinterested magistrate.

¶ 22 The prosecution could have appealed this ruling under section 16-12-102(2) and C.A.R. 4.1, which together provide for

"interlocutory appeal[s] to challenge certain types of adverse suppression rulings, including the suppression of evidence obtained from a search that the trial court deemed unlawful." *People v. Zuniga*, 2016 CO 52, ¶ 11. Review must be sought "within 14 days after the entry of the order complained of." C.A.R. 4.1(b). No such appeal was taken.

¶ 23 "Appeals by the prosecution are permitted in this state pursuant to . . . [s]ection 16-12-102." *People v. Hinchman*, 40 Colo. App. 9, 13, 574 P.2d 866, 869 (1977), *aff'd in part and rev'd in part*, 196 Colo. 526, 589 P.2d 917 (1978). And "interlocutory appeals authorized by statute are permissive rather than mandatory." *People v. Moore*, 226 P.3d 1076, 1091 (Colo. App. 2009) (quoting *People v. Richardson*, 58 P.3d 1039, 1047 (Colo. App. 2002)). Thus, mere failure to file an interlocutory appeal under section 16-12-102(2) does not automatically preclude an appeal under section 16-12-102(1), once final judgment has been entered.

¶ 24 But the procedural question before us goes beyond timing. Because appeals taken by the prosecution "are strictly limited by law," *People v. Martinez*, 22 P.3d 915, 919 (Colo. 2001) (quoting *People v. Tharp*, 746 P.2d 1337, 1339 (Colo. 1987)), the

requirements of section 16-12-102(1) must still be met. This section is narrow. It permits the prosecution to appeal "any decision of a court in a criminal case upon any question of law." § 16-12-102(1). Combining these principles, because an appeal under this section "is necessarily limited to questions of law only," it "does not give the [prosecution] a basis upon which to challenge the trial court's assessment of the evidence." *Martinez*, 22 P.3d at 919 (dismissing appeal by People that implicated not purely legal questions, but factual questions whose resolution fell within province of trial court).

¶ 25 By any fair reading, the trial court rejected the good faith argument at the first suppression hearing. Thus, the Attorney General is appealing that ruling, not — as in *Aarness*, 150 P.3d at 1277 — merely "defend[ing] the trial court's judgment" to suppress at the second hearing on a different ground.[2] With *Aarness* beyond

---

[2] No notice of appeal or cross-appeal has been filed. Under C.A.R. 4(b)(2), "[u]nless otherwise provided by statute or Colorado appellate rule, when an appeal by the state or the people is authorized by statute, the notice of appeal shall be filed in the Court of Appeals within 49 days after the entry of judgment or order appealed from." In addition, "C.A.R. 4(b) mandates that both parties submit their notices of appeal during the same . . . period. The rule does not

10

reach, the Attorney General's argument can raise only a question of law. And therein lies the problem.

¶ 26     Unless the parties have stipulated to the facts, a ruling on a motion to suppress is not a pure question of law under section 16-12-102(1). To the contrary, "[w]hen ruling on a motion to suppress, a trial court 'must engage both in factfinding — a specific inquiry into the historical phenomena of the case — and law application, which involves the application of the controlling legal standard to the facts established by the evidence.'" *People v. King*, 16 P.3d 807, 812 (Colo. 2001) (quoting *People v. Quezada*, 731 P.2d 730, 732 (Colo. 1987)); *see also People v. Gabriesheski*, 262 P.3d 653, 658 (Colo. 2011) ("While in limine evidentiary rulings may involve the construction of statutes or rules, or some similar question of law, a trial court's decision to admit or exclude evidence is not, in and of itself, an appealable question of law . . . .").

¶ 27     Examining *People v. Welsh*, 176 P.3d 781, 791 (Colo. App. 2007), sounds the death knell for the Attorney General's position. There, the Attorney General had cross-appealed under section

provide for sequential submissions, as is provided for civil cross-appeals." *People v. Gilmore*, 97 P.3d 123, 128 (Colo. App. 2003).

11

16-12-102(1) two trial court evidentiary rulings. In addressing one of the rulings, the division explained that while "evidentiary rulings are matters committed to a trial court's discretion . . . [s]uch rulings may nevertheless be appealable under [section] 16-12-102(1) if the trial court made its ruling based on an assertedly erroneous interpretation of the law." *Id.* at 791.

¶ 28     But unlike in *Welsh*, here the Attorney General does not challenge the trial court's consent ruling based on a question of law. Instead, the answer brief sets forth factual arguments about consent to explain why the court erred in finding a lack of good faith. For example, "the officer did make reasonable inquiries and conducted independent legal research to confirm the towing company's authority to consent."

¶ 29     For these reasons, the validity of the initial search is not properly before us.

### 2.  The Law of the Case Does Not Apply

¶ 30     Next, we turn to George's argument that the trial court should have suppressed data obtained from the second examination of the GPS device because the first suppression order

12

> was not only law of the case; it was an unchallenged order that applied the exclusionary rule. The prosecutor did not appeal the ruling and the trial court did not reconsider it. An exception to the exclusionary rule cannot be established by an end-run around an order finding its applicability.

This argument fares no better than the Attorney General's attempt to relitigate the validity of the initial search.

¶ 31　To be sure, under the law of the case doctrine, "[p]rior relevant rulings made by the trial court in the same case are generally to be followed." *People v. Roybal*, 672 P.2d 1003, 1005 n.5 (Colo. 1983). This rule makes sense because "courts generally . . . refuse to reopen what has been decided." *People ex rel. Gallagher v. Dist. Court*, 666 P.2d 550, 553 (Colo. 1983) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). And it "protects litigants from the expenditure of time and money involved in the reargument of settled issues." *Super Valu Stores, Inc. v. Dist. Court*, 906 P.2d 72, 79 (Colo. 1995).

¶ 32　As to appellate rulings, the law of the case doctrine means that "[t]rial courts have no discretion to disregard" them. *McGillis Inv. Co., LLP v. First Interstate Fin. Utah LLC*, 2015 COA 116, ¶ 58 (alteration in original) (quoting *Hardesty v. Pino*, 222 P.3d 336, 339

13

(Colo. App. 2009)). Otherwise, this doctrine has been described as a discretionary rule of practice when applied to a court's power to reconsider its own prior rulings. *Id.* And George seeks to invoke it based on only the trial court's earlier ruling.

¶ 33 Still, George relies on *Roybal*, 672 P.2d 1003, to argue that the trial court's initial ruling suppressing the contents of the GPS device is the law of the case.

¶ 34 In *Roybal*, on the prosecution's interlocutory appeal, the supreme court upheld the suppression of written statements given by the defendant because probable cause did not exist for his arrest. *Id.* at 1004. After that decision, the defendant moved to suppress the results of a blood alcohol test that also flowed from his arrest. The trial court held that the prosecution was precluded from presenting additional evidence on probable cause for the arrest and suppressed the test results.

¶ 35 On a second interlocutory appeal, the supreme court again affirmed. The court explained that trial court rulings "logically necessary to the holding of the appellate court" — such as the initial probable cause ruling — "become the law of the case." *Id.* at 1005. It also cautioned that "the prosecution must be prepared to

14

abide the consequences of an adverse ruling when it elects not to offer available probative evidence." *Id.* at 1006.

¶ 36    Similar to this case, *Roybal* involved a prior suppression ruling. But for two reasons, *Roybal* does not carry the weight that George places on it.

¶ 37    First, in *Roybal* the trial court's suppression ruling was necessary to the holding of the supreme court, which had to be followed in later proceedings. Here, no appellate court has ruled on the suppression issue.

¶ 38    Second, unlike in *Roybal*, the issues decided in the two suppression hearings differed. The first hearing involved the validity of a warrantless search based on consent; the second hearing turned on whether the second search was valid because the warrant represented an independent source. *See People v. Washington*, 179 P.3d 153, 166 (Colo. App. 2007) (finding that law of the case did not apply where "the legal issue decided by the trial court and the factual issue to be resolved by the jury were different"), *aff'd*, 186 P.3d 594 (Colo. 2008). In other words, at the second hearing the prosecution was not seeking to introduce additional evidence on consent or, for that matter, good faith. And

because the warrant had not yet been sought, the prosecution's independent source argument in the second hearing would have been premature at the first hearing. *See United States v. Dexter*, 165 F.3d 1120, 1124 (7th Cir. 1999) ("The law of the case doctrine should not be read so rigidly that it precludes a party from raising an argument that it had no prior opportunity to raise." (quoting *Bagola v. Kindt,* 131 F.3d 632, 637 (7th Cir. 1997))).[3]

¶ 39    Comparing the following two cases shows why the law of the case doctrine provides George no refuge.

¶ 40    In *State v. Parry*, 390 P.3d 879, 882-86 (Kan. 2017), the defendant moved to suppress evidence obtained during a

---

[3] Nor does collateral estoppel help George. *See State v. Johnson*, 191 Wash. App. 1008 (2015), 2015 WL 6873473, at *2, *3 (unpublished opinion) (The court addressed whether a trial court ruling "on the validity of the first warrant was binding on any subsequent application for a warrant to search the same records." In declining to apply collateral estoppel, the court explained that "the warrant the court determined to be invalid was a different warrant from the warrant that later authorized the search of the cell phone and seizure of the data."); *see also State v. Seager*, 571 N.W.2d 204, 207 (Iowa 1997) (considering situation where the prosecution had dismissed murder charges against the defendant based on an invalid search warrant, and after a second warrant was obtained, new charges were filed; on appeal, the supreme court declined to apply collateral estoppel to the warrant issue because the latter case involved the validity of the second warrant, whereas the issue decided in the earlier proceeding was the validity of the first warrant).

warrantless search. The trial court rejected the prosecution's consent argument. On the prosecution's interlocutory appeal, the suppression ruling was upheld.

¶ 41    The prosecution then dismissed the first case without prejudice and refiled the charges. Again, the defendant moved to suppress. This time, the prosecution argued that exigent circumstances existed or, alternatively, that the evidence inevitably would have been discovered. *Id.* at 881. But the trial court still sided with the defendant.

¶ 42    Undaunted, the prosecution took another interlocutory appeal. The Kansas Court of Appeals upheld the second suppression ruling based on law of the case, and the supreme court affirmed. It agreed with the court of appeals that "[t]he State wanted a do-over on the issue of the constitutionality of the police search of [the defendant's] residence . . . so it could assert arguments it failed to raise during the first hearing." *Id.* at 885 (quoting *State v. Parry*, 358 P.3d 101, 104 (Kan. Ct. App. 2015)). The supreme court further agreed that "[t]he State wants to garner another hearing in the [trial] court to make additional arguments on the issue. Law of the case aims to prevent precisely that sort of repetitive airing of points already

decided in the [trial] court and reviewed on appeal." *Id.* (quoting *Parry*, 358 P.3d at 104).

¶ 43    In contrast, the court in *United States v. Hanhardt*, 155 F. Supp. 2d 840, 845-53 (N.D. Ill. 2001), declined to apply the law of the case doctrine. There, the police conducted a warrantless search of the defendant's briefcase, and a trial court granted his motion to suppress all evidence obtained from the briefcase. This ruling was upheld on appeal. Then the police sought and obtained a warrant to search the briefcase, which had remained in police custody. Again, the defendant argued that the evidence must be suppressed — this time because the appellate court ruling upholding the first suppression order was law of the case.

¶ 44    Applying the independent source doctrine, the *Hanhardt* court held that evidence discovered in the second search of the defendant's briefcase based on the warrant was admissible, despite suppression of the same evidence in the earlier case. *Id.* at 849. The court declined to apply law of the case because "the issues in this motion are not the same matters that were presented to the [appellate court]." *Id.* at 855. Specifically, the appellate decision "decided the admissibility of evidence obtained from [the

defendant's] briefcase during the warrantless . . . search," whereas "[t]he issues here are . . . the applicability of the independent source doctrine and the admissibility of the same evidence found during the search executed pursuant to . . . [a] warrant. *Id.* at 853.

¶ 45     Returning to the case before us, had the prosecution attempted to relitigate consent, or to advance new reasons to support the warrantless search — as in *Parry* — the question would be closer. But our case is more like *Hanhardt.* The warrant at issue in the second suppression hearing raised a different issue — independent source — that was not and could not have been raised at the first suppression hearing.

¶ 46     In sum, we decline George's invitation to apply the law of the case doctrine. Our conclusion leaves George with only the argument that the warrant was not an independent source of the evidence. This argument also falls short.

### 3. The Warrant Was Based On an Independent Source

¶ 47     The independent source doctrine raises two questions. First, was "the decision to seek the warrant . . . prompted by what was observed during the initial entry"? *Schoondermark*, 759 P.2d at 719. Second, was "information obtained during that entry . . .

relied upon by the magistrate in issuing the warrant"?  *Id.*

Addressing each question in turn, we answer both "no."

### a. The Decision to Seek the Warrant Was Independent of the Fruits of the Earlier Unlawful Search

¶ 48    The first inquiry focuses on whether law enforcement "would have sought the warrant even if they had not" obtained useful information from the earlier unlawful search.  *Id.*

¶ 49    The trial court found, with record support, that had the towing company not asserted ownership of the GPS device and given its consent to examination, the investigator would have sought a warrant to search the device.  This finding supports the court's conclusion that the investigator did not later seek a warrant based on the fruits of the warrantless search.  Also, it avoids the need for a remand to address whether "the officers would have sought the warrant even absent the information gained by the initial illegal entry."  *Id.*

¶ 50    Still persisting, George asserts that the investigator was not motivated by an independent source because the warrant was "intended [as a] curative measure to circumvent a valid court order"; and in any event, the warrant application "was deceptive to

the issuing judge to whom the fact of the suppression order was not disclosed."

### i. Motive

¶ 51 Somewhat attractive at first blush, George's motive argument ultimately misses the mark because it misapprehends the independent source doctrine. *See People v. Pahl*, 169 P.3d 169, 175 (Colo. App. 2006) (The independent source doctrine focuses on whether the warrant "was based upon information independent from what was observed during the illegal search.").

¶ 52 True, absent the suppression order, the investigator would have had no reason to seek a warrant. After all, until the evidence was suppressed, the investigator had relied on the towing company's consent. But this observation only gets George half way.

¶ 53 While the suppression order prompted the investigator to seek a warrant, the objective of avoiding the consequences of that order does not equate to an improper motive arising from the fruits of the unlawful search. Otherwise, mere existence of such an order would invariably swallow the independent source exception. This is so because if an earlier — and unlawful — search bore no fruit, a

defendant would never move to suppress, and law enforcement would never seek to develop an independent source.

¶ 54 A similar assertion was rejected in *Hanhardt,* 155 F. Supp. 2d. at 852. The court explained that the "proffered reason for seeking a warrant, the outcome of the suppression litigation . . . , is a valid reason to seek a warrant, and is not based on anything learned from the [unlawful] search." *Id.*; *see also United States v. Johnson,* 994 F.2d 980, 987 (2d Cir. 1993) (Applying the independent source doctrine to illegally seized tapes where "[o]nce the district court expressed reservations about the legality of the review of the tapes, the government realized that a warrant was necessary.").

¶ 55 We agree with this reasoning and decline to hold that the decision to seek a warrant because of a prior suppression order alone precludes the warrant from being an independent source.

### ii. Deception

¶ 56 As to George's second argument, everyone would agree that the investigator did not tell the magistrate who issued the warrant about the prior unlawful search or the suppression order. Although the record does not tell us why, does the investigator's failure to do

22

so vitiate the second search? This question is closer and the few courts to have addressed it are divided.

¶ 57    On the one hand, *State v. Krukowski,* 100 P.3d 1222, 1223 (Utah 2004), addressed "whether police officers seeking a search warrant are obligated to disclose to the magistrate a prior illegal entry onto the premises to be searched." There, the defendant successfully "moved to suppress th[e] evidence on the ground that the police officers had not informed the magistrate of the prior illegal entry when seeking the warrant." *Id.* The supreme court reversed, holding:

> [P]olice officers are not required to disclose prior illegal entries when seeking a search warrant; such entries are simply not material to a magistrate's determination of probable cause, and the potentially prejudicial effect of disclosing to the magistrate a prior illegal entry outweighs any conceivable benefit to be obtained from it.

*Id.* at 1225. It noted the "importance of candor in the search warrant process," but explained that a

> [p]olice officers' duty to be candid to magistrates when seeking warrants does not impose an affirmative duty on them to disclose matters immaterial to a determination of probable cause. Here, the prior illegal entry does not bear upon probable cause, which

must be established on the basis of circumstances existing and evidence observed independent of the illegal entry.

*Id.* at 1226.

¶ 58      On the other hand, in *United States v. Whitworth*, 856 F.2d 1268, 1281-82 (9th Cir. 1988), the court held:

> We do not believe it is proper for law enforcement officials to withhold information regarding prior searches of the same premises from magistrates considering warrant applications. If "taint" is feared, *the better practice is to advise the magistrate that an earlier consent search had been conducted and provide the reasons why a warrant is still required.* The affiant could affirmatively state that nothing obtained in the first search is being relied on in seeking the warrant. At that point, the magistrate can properly evaluate the situation and determine whether probable cause still exists.

(Emphasis added.) Still, the court concluded "[o]n these facts, the failure to disclose the limited consent search could not have affected the decision to issue the warrant. The government's application was extensive and did not rely on any of the evidence seized earlier." *Id.* at 1282.[4]

---

[4] *See also Cruse v. State*, 584 P.2d 1141, 1145-46 (Alaska 1978) ("Although we hold that the second search was not tainted by the assumed illegality of the first intrusion, we believe it is necessary to

¶ 59    By any reckoning, the better practice would be for the requesting officer to tell the issuing magistrate about a prior unlawful search or suppression order. Even so, the failure to do so does not necessarily mean that the fruits of the earlier unlawful search impermissibly motivated law enforcement. And the independent source doctrine looks no deeper into motive.

¶ 60    In issuing the warrant, the magistrate was unaware of the prior unlawful search or suppression order. Of course with such knowledge, the magistrate might well have examined the warrant application more rigorously. *See Krukowski*, 100 P.3d at 1227 ("[P]rior illegal entry . . . is material to a trial court's assessment of the officer's credibility and the independent source doctrine in the context of a motion to suppress.").

¶ 61    When conducting the suppression hearing, however, the trial court knew the whole story. One might wonder whether

_____

address the investigator's failure to inform the district court that a search had already been conducted. Appellant argues that if prior police misconduct can be concealed from the court, and thereby protect evidence which might otherwise be inadmissible, there will be no deterrent against illegal searches. We agree that the concealment of relevant material from the judge issuing the warrant cannot be condoned. However, we cannot find that such concealment vitiated the validity of the warrant in this case.").

concealment from the magistrate suggests broader mendacity of the investigator. Even if so, the court could have considered concealment in assessing the investigator's testimony that the fruits of the unlawful search had not motivated him to seek the warrant. Indeed, defense counsel argued during the second hearing that the investigator was intentionally circumventing the trial court by submitting the warrant to the uninformed magistrate.

¶ 62 Despite all of this, George argues that allowing law enforcement to seek a warrant after an adverse suppression ruling "promotes the very misconduct [the independent source doctrine] is designed to discourage." But the independent source doctrine does not discourage police misconduct. Rather, looming large over this issue is the objective of the independent source doctrine. It has been described as follows:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position than they would have been in if no police error or misconduct had occurred . . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Murray v. United States*, 487 U.S. 533, 537 (1988) (alteration in original) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)).

¶ 63     Still, some may see following the independent source doctrine as at odds with the deterrence that results from applying the exclusionary rule.  After all, were the Fourth Amendment to categorically deny law enforcement a second bite at the apple, officers might be more cautious; here, the investigator might have sought a warrant rather than relying on the consent of a third party who did not share George's privacy interest.  But in *Murray*, the Supreme Court struck the balance differently.  And the Supreme Court rejected the argument that the independent source doctrine "applies only to evidence obtained for the first time during an independent lawful search."  *Id.*

¶ 64     Nor should one hastily conclude that falling back on the independent source doctrine comes without a price.  Law enforcement agents relying on the independent source doctrine risk suppression of evidence, and they increase their burden from one of probable cause to the "much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or

27

the magistrate's decision to grant it." *Id.* at 540. So, the availability of this do-over does not necessarily immunize law enforcement from the consequences of earlier incautious action.

¶ 65    In the end, before the towing company gave its consent to examine the GPS device, the investigator was prepared to seek a warrant. Treating his mistaken belief in consent and the resulting suppression order as forever barring the investigator from doing so would place him in a worse position. Under binding Supreme Court precedent, that we cannot do.

¶ 66    Instead, we turn to whether anything in the warrant application was derived from the fruits of the prior unlawful search.

### b. The Warrant Application Did Not Include Information from the Fruits of the Unlawful Search

¶ 67    George fails to identify anything specific in the warrant application to show that the investigator improperly presented the magistrate with information derived from the initial examination of the GPS device. To the contrary, the investigator's affidavit included the following information, which was wholly independent of the unlawful search:

> This Affiant is aware that GPS units are used
> to assist in driving directions when traveling

28

across country as well as to assist in finding locations when moving to a new town. Based on this Affiant's training and experience, as well [as] the knowledge this Affiant has regarding the investigations involving both victims . . . it is likely that [defendant] used this vehicle to travel to meet with each victim. [Defendant] could have used the . . . GPS device . . . to assist him in finding those locations.

¶ 68  The affidavit also explained that "while data [from GPS devices] can be deleted[,] a forensic examination can often recover information previously stored/searched which could be of evidentiary value in the investigation of this case." This description is generic, unique to neither George's device nor its contents.

¶ 69  Not easily deterred, George argues that the warrant application was not independent because the investigator "directly cop[ied] the information . . . from his first report." He is correct, but only to a point.

¶ 70  This report was prepared after the initial unlawful search. But including in the affidavit information from the first report is unsurprising because the report contained background from the entire investigation. As the investigator explained during the second suppression hearing:

> Q: That warrant did it include any information that you had gained from the first search of the GPS unit?
>
> A: . . . [I]t's very difficult to write something . . . when you have other knowledge, so I tried my best not to include things that were based on the first search. I did use cut and paste because the words are going to be the same. Dates are going to be the same. The time frames are going to be the same. My e-mails are going to be the same. Nothing has changed there. What I tried to avoid was any knowledge I gained from the search itself.

*See Morley*, 4 P.3d at 1081 (applying independent source doctrine where "the affidavit supporting the warrant relied only on facts obtained during the undercover operation").[5]

¶ 71    Instead, the proper question is whether the affidavit included information from the report that related to the fruits of the unlawful search. This question is one of law, which we answer by examining the affidavit to determine whether any information derived from the unlawful search was included, and if it was, whether by

---

[5] *See Schaffer*, 739 P.2d at 327-28 ("Since the prior search warrant was the subject of a suppression motion which was granted, appellants assert that . . . [the officer's] knowledge as to the location of appellants' residence . . . should not be used as a basis for securing a later search warrant. We disagree. Appellants have cited no authority for the proposition that an officer cannot participate in a second search warrant if the officer engaged in a prior invalid search warrant.").

disregarding the unlawfully obtained information, the remaining lawfully obtained information establishes probable cause. *People v. Sprowl*, 790 P.2d 848, 849 (Colo. App. 1989); *see Cruse*, 58 P.3d at 1121 ("[T]he question whether illegally obtained information included in a warrant affidavit affected the issuing court's decision is a question of law.").

¶ 72    Doing so, we do not reach the second tier of this analysis because we are unable to identify any information from the unlawful search in the affidavit. Nor, as indicted above, does George direct us to any such information. As a result, we necessarily conclude that none of the "information obtained during [the unlawful search] was relied upon by the magistrate in issuing the warrant." *People v. Diaz*, 53 P.3d 1171, 1177 (Colo. 2002) (quoting *Schoondermark*, 759 P.2d at 719).

¶ 73    Therefore, we uphold the trial court's decision not to suppress evidence from the GPS device.

## III. The Trial Court Did Not Abuse Its Discretion in Joining the Cases for Trial

¶ 74    Before trial, the prosecution moved to join the cases involving A.R. and G.D.  George objected.  After a hearing, the trial court granted the motion.

¶ 75    The court found that evidence from each case would be admissible in the other under section 16-10-301, C.R.S. 2016, and CRE 404(b) because "the other act evidence indicates more than bad character, namely common plan or scheme; intent/mental state; identity; motive/absence of mistake; and lack of recent fabrication."  It also found "no persuasive showing that the evidence in one case is substantially stronger than in the other case so as to preclude consolidation," and "no persuasive showing that a jury will be unable to separate the facts and legal theories applicable to each offense or that consolidation prevents [George] from testifying in one separate case and not the other."

¶ 76    On the first day of trial, George renewed his objection and moved to sever the cases.  He argued that because A.R. had "admitted to the prosecution that she had lied to law enforcement regarding the sexual encounter with [George] in the public park,"

32

joining the cases would cause the jury to "overlook the significant credibility issues with A.R." Again, the court denied the motion. At the end of the trial, it instructed the jury to consider each charge separately from all other charges.

### A. Standard of Review and Law

¶ 77 "Subject to the relief afforded in Crim. P. 14, a trial court may order two or more criminal complaints to be tried together if the offenses could have been joined in a single complaint." *People v. Gregg*, 298 P.3d 983, 985 (Colo. App. 2011) (citing Crim. P. 13). Two or more offenses may be joined in a single complaint if, among other things, they are part of a common scheme or plan. *Id.* (citing Crim. P. 8(a)(2)); *see also People v. Williams*, 899 P.2d 306, 313 (Colo. App. 1995).

¶ 78 A trial court's decision to join separate charges for trial is reviewed for an abuse of discretion. *Gregg*, 298 P.3d at 985. The trial court does not abuse its discretion unless the consolidation causes actual prejudice to the defendant. *Id.*

¶ 79 As relevant here, the defendant cannot show prejudice where evidence of each offense would have been admissible in separate trials. *Id.* at 986; *see People v. Curtis*, 2014 COA 100, ¶ 16 ("Sexual

assault offenses may be joined if the evidence of each offense would be admissible in separate trials."). Under CRE 404(b) and section 16-10-301(3), the trial court may admit evidence of other acts to establish, for example, motive, opportunity, intent, preparation, common plan or scheme, knowledge, identity, or absence of mistake or accident.

## B. Application

¶ 80    George argues that evidence related to A.R. and G.D. "was not sufficiently similar" to be admissible in separate trials to establish a common plan or scheme under CRE 404(b) and section 16-10-301(3).[6]  But the trial court rejected this very argument, finding that

> [George] contacts young females over the internet, requests personal information about them, offers to date or establish a relationship with them, then meets with them in a semi-public area near the child's home at

---

[6] George also disputes admissibility to show intent, identity, absence of mistake, or fabrication. However, because we uphold the trial court's ruling on common plan or scheme, we need not address these arguments. *See People v. Copeland*, 976 P.2d 334, 337 (Colo. App. 1998) ("Because the trial court's ruling concerning admissibility to prove motive is not manifestly arbitrary, unreasonable, or unfair . . . we need not determine whether the evidence was admissible for [opportunity, plan, or identity]."), *aff'd*, 2 P.3d 1283 (Colo. 2000).

which time he moves quickly to isolate them
and establish a sexual relationship.

The court created a chart (*see infra* Appendix) that set forth the many similarities and few differences between the two victims.

¶ 81     Then the court explained that "although there are some differences between the way the alleged sexual contacts occurred with regard to A.R. and G.D. the acts are such that they are naturally to be explained as individual manifestations of a general plan or course of conduct." It further held that the evidence was "logically relevant to show [George's] tendency to commit an act in a particular way, as opposed to his general character, and the evidence makes it at least somewhat more probable that [George] committed the crimes alleged."

¶ 82     George does not dispute the similarities found by the trial court. Instead, to argue against common plan, he emphasizes the dissimilarities between the victims noted by the trial court. But this emphasis ignores the larger point: "[C]ommon plan evidence does not depend entirely on the similarity between the charged and uncharged acts to be admissible." *People v. Williams*, 2016 COA 48, ¶ 31.

¶ 83     Examples of permissible dissimilarity abound.  In "sexual assault cases, such evidence is admissible even when the other misconduct involved different victims."  *Williams*, 899 P.2d at 312. Nor need common plan evidence "be part of one ongoing transaction."  *People v. Casper*, 641 P.2d 274, 275 (Colo. 1982). Rather, "[i]n order for two or more acts to constitute a scheme, they must have a nexus with each other from which a continuous scheme or common design can be discerned."  *People v. Close*, 867 P.2d 82, 87 (Colo. App. 1993), *disapproved of on other grounds by Bogdanov v. People*, 941 P.2d 247 (Colo. 1997), *amended*, 955 P.2d 997 (Colo. 1997).

¶ 84     The trial court acted well within its discretion in finding that evidence related to A.R. and G.D. met this broader standard.[7]  As the chart shows, the victims were nearly the same age when George contacted them, he met them in the same way and near the same time, and he initiated personal contact with them for the same purpose.  *See People v. Jones*, 2013 CO 59, ¶ 27 ("[T]he evidence

---

[7] George argues "the trial court did not find that evidence of one case was necessary to prove a material issue in the other."  But he cites no authority adopting this standard.  Rather, the test is whether the evidence would have been admissible in the separate trials.

could lead to the inference that Jones had a common plan, scheme, or design to have sexual relations with white women who had been drinking without their consent late at night while holding their mouths closed."); *People v. Janes*, 942 P.2d 1331, 1336 (Colo. App. 1997) (finding evidence of prior sexual assault convictions admissible to show common plan despite seven-year time difference because of the level of similarity); *People v. Delgado*, 890 P.2d 141, 143-44 (Colo. App. 1994) (noting that while evidence of common plan typically requires "a nexus or relationship . . . a series of acts of sufficient similarity" may also allow such an inference).

¶ 85    Because George has not shown prejudice, we conclude that the trial court properly joined the trials involving A.R. and G.D.

## IV.  Conclusion

¶ 86    The judgment is affirmed.

JUDGE BERNARD and JUDGE DUNN concur.

| Similarity | 11CR1503 | 12CR1029 |
|---|---|---|
| Child's sex | Female | Female |
| Child's age | 14 | 12 |
| Source of contact | On-line Mocospace | On-line INVU.com |
| Child's age promptly disclosed to perpetrator | Yes | Yes |
| Adjustment problems in child's family | Yes | Yes |
| Proximity in time of first contact | February/March 2011 | Approximately March-June 2011 |
| Perpetrator communicated with the child over the internet | Yes | Yes |
| Perpetrator communicated with the alleged victim by text | Yes | Yes |
| Perpetrator identified himself as "Matthew George" | Yes | Yes |
| Perpetrator requested the alleged victim "go out with him" or be his girlfriend | Yes | Yes |
| Perpetrator requested photos or "naughty" – type photos from the alleged victim | Yes | Yes |
| Perpetrator requested information on child's physical | Yes | Yes |

| | | |
|---|---|---|
| attributes | | |
| Proximity in time of first meetings | April 3, 2011 | Sometime in March-June 2011 |
| Perpetrator arranged for first meeting at a semi-public area near the alleged victim home | Yes (park) | Yes (cemetery and elementary school after school hours) |
| Perpetrator arranged for meeting with no other persons present | Yes | Yes |
| Encounter quickly becomes sexual | Yes | Yes |
| Nature of sexual contact | Included fondling of breasts and kissing | Included fondling of breasts and kissing |
| Perpetrator inquired about going to perpetrator's home or the alleged victim's home | Yes | Yes |

| Dissimilarity | 11CR1503 | 12CR1029 |
|---|---|---|
| Perpetrator provided the alleged victim a cell phone to use to contact him | Yes | No |
| Number of sexual contacts | Multiple | One |
| Nature of sexual contacts | Included sexual intercourse and oral sex | Included digital penetration and forced masturbation of the perpetrator |
| Perpetrator took photos of the alleged victim | Yes | No |