21CA0814 Peo v Rivers 05-21-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA0814
El Paso County District Court No. 18CR2300
Honorable Frances Johnson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Nashid Rayon Rivers,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE BROWN
Harris and Tow, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 21, 2026

---

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver,
Colorado, for Plaintiff-Appellee

Mark G. Walta, Alternate Defense Counsel, Littleton, Colorado, for Defendant-
Appellant

¶ 1      Defendant, Nashid Rayon Rivers, appeals the judgment of conviction entered on a jury verdict finding him guilty of numerous felonies arising out of a double homicide. We affirm in part, vacate in part, and remand to the district court to correct the mittimus.

## I.      Background

¶ 2      On April 21, 2018, police responded to a 911 call from the residence that Rivers shared with his mother, stepfather, and brother concerning an alleged home invasion. Rivers' mother invited the responding officers inside, and the officers found Rivers with burns on his hands and legs. Rivers' mother also alerted the officers to a nine millimeter handgun she found in a laundry basket. The firearm smelled of gasoline. Family members reported that Rivers had said "he killed two people and set them on fire." The officers interviewed Rivers for two hours before transporting him to the hospital to receive treatment for his burns.

¶ 3      Later that day, police responded to reports of a suspicious vehicle idling in a secluded cul-de-sac in Colorado Springs. The responding officers observed blood dripping from the driver's side door onto the ground, but the vehicle's windows were darkly tinted and covered in soot, so the officers could not see inside. The

officers opened the driver's side door and observed a female in the driver's seat and a male in the passenger seat. Both occupants appeared to be deceased, had bullet wounds in their heads, were stained with blood, and had singed hair.

¶ 4      The officers also smelled the odor of gasoline emanating from the car and observed that the inside of the vehicle had been burned. Outside the vehicle, officers discovered a lighter, a burnt bandana, and a phone charger. A silver Apple iPhone was later discovered a short distance from where the vehicle had been parked. The iPhone and the phone charger both contained evidence that connected the items to Rivers.

¶ 5      The victims were identified as Serena Garcia and Marcus Denton. Autopsies confirmed that both victims suffered multiple nine-millimeter gunshot wounds to the backs and sides of their heads. Ballistics testing confirmed that the handgun discovered at Rivers' residence was likely used in the shootings, and traces of Denton's blood were found on the weapon.

¶ 6      During the ensuing investigation, police received information that Marquis Hazard and his girlfriend, Shailynn Ryles, may have played a role in the murders. Specifically, text messages and

2

Snapchat records revealed that Rivers and Hazard planned to carry out "a deal" to procure and sell marijuana on April 21. Police officers contacted Hazard and Ryles and searched their vehicle. The officers observed that the driver's side rear passenger seat appeared to be burned.

¶ 7    Ryles, who was charged with being an accessory to the murders, agreed with the prosecution that she would cooperate with the police investigation and provide truthful testimony in exchange for sentencing concessions. At Rivers' trial, she testified as follows:

- On the morning of April 21, Hazard received a call from someone named "Trench," later identified as Rivers, and then directed Ryles to drive with Hazard to the west side of Colorado Springs.

- The two parked their car in a cul-de-sac. Eventually, a brown car pulled up and sat idling in the cul-de-sac for a few minutes.

- Although Ryles testified inconsistently about the sequence of events, at some point Ryles received a phone call from Rivers, but all she could hear over the phone was "loud

music" playing. And at some point Ryles heard two "loud noises" come from outside the vehicle, but she could not identify precisely the source of the noises.

- A few minutes later, Ryles saw Rivers emerge from the back seat of the idling car and run toward her car. Rivers was on fire. When Rivers jumped into the back seat, Ryles doused him with water to extinguish the flames. Ryles observed that Rivers was carrying a gun and a bottle of gasoline or lighter fluid. Rivers instructed Ryles and Hazard to drive away quickly.

- Ryles, Hazard, and Rivers proceeded to a nearby apartment to dispose of Rivers' clothes. While they were driving, Rivers said that he "domed" the victims in the idling vehicle.[1]

- Following the murders, and after Ryles and Hazard brought Rivers to his home, Rivers told Ryles and Hazard that they could have "whatever [was] in the [idling] vehicle."

---

[1] Ryles was unfamiliar with what "domed" meant at the time Rivers said this, but testimony at trial revealed that the term is slang for when one shoots another in the head.

¶ 8    Rivers was charged with multiple felonies arising out of the murders. After a ten-day trial, a jury found Rivers guilty of two counts of first degree murder (after deliberation) — one for each victim; two counts of felony murder predicated on "arson and/or robbery" — one for each victim; conspiracy to commit first degree murder; second degree arson; attempt to commit tampering with a deceased human body; tampering with physical evidence; and ten crime of violence sentence enhancers. The district court sentenced Rivers to life without the possibility of parole in the custody of the Department of Corrections.

## II.    Analysis

¶ 9    Rivers contends that the district court erred by denying his (1) challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the prosecution's exercise of a peremptory strike and (2) motion to suppress evidence arising from an investigator's search of his cell phone. We disagree.

¶ 10    Rivers further contends that the evidence presented at trial was insufficient to sustain his convictions for felony murder based on the predicate offense of second degree arson. Although the People contend that there was sufficient evidence to sustain the

felony murder convictions, they nevertheless concede that the court erred by entering separate convictions for first degree murder (after deliberation) and felony murder. We agree with the People, vacate Rivers' convictions and sentences for felony murder, and remand the case with instructions for the court to amend the mittimus accordingly. Because of this disposition, we need not address Rivers' sufficiency challenge.

## A. *Batson* Challenge

¶ 11 Rivers contends that the district court erred by denying his *Batson* challenge to the prosecution's exercise of a peremptory strike dismissing C.S., one of few African American[2] potential jurors. We discern no error.

### 1. Applicable Law and Standard of Review

¶ 12 The Equal Protection Clause of the Fourteenth Amendment forbids a challenge to a potential juror based solely on race. *Batson*, 476 U.S. at 89; *see People v. Ojeda*, 2022 CO 7, ¶ 19; *People v. Wilson*, 2015 CO 54M, ¶ 10 n.4. When a party raises a

---

[2] C.S. did not disclose his race or ethnicity, so we cannot determine if he identified as African American or Black or with another racial group. Both parties on appeal refer to him as African American, so we adopt the same nomenclature.

*Batson* challenge, the trial court must engage in a three-step analysis to assess the claim of racial discrimination. *Ojeda,* ¶ 21.

¶ 13 First, the opponent of the peremptory strike must make a prima facie showing that the strike was based on race. *Id.* Second, if a prima facie showing is made, the burden shifts to the striking party to provide a race-neutral explanation for excusing the potential juror. *Wilson,* ¶ 10. Third, the trial court must decide the ultimate question: whether the objecting party has established purposeful discrimination. *Ojeda,* ¶ 27; *see People v. Owens*, 2024 CO 10, ¶ 78 ("A peremptory strike is purposely discriminatory" if it is "motivated in substantial part by discriminatory intent." (quoting *Flowers v. Mississippi,* 588 U.S. 284, 303 (2019))). In other words, "[t]he inquiry at step three requires the trial court to decide whether to believe counsel's race-neutral explanation for a peremptory challenge." *Wilson,* ¶ 13.

¶ 14 Rivers' appellate contentions only concern the third step of the court's *Batson* analysis. In deciding the ultimate question, the court "must gauge the prosecutor's credibility by evaluating [their] demeanor, how reasonable or improbable [their] explanations are, and whether [their] 'proffered rationale has some basis in accepted

7

trial strategy.'" *Id.* at ¶ 14 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)). The court should also consider (1) "a prosecutor's use of peremptory strikes against Black, as compared to white, prospective jurors"; (2) "disparate questioning and investigation of Black and white jurors"; (3) "side-by-side comparisons of Black prospective jurors who were struck and white prospective jurors who were not"; and (4) "misrepresentations of the record in defending strikes during a *Batson* hearing." *Owens,* ¶ 78.

¶ 15     "On appeal, each step of the trial court's *Batson* analysis is subject to a separate standard of review." *Ojeda,* ¶ 30 (quoting *People v. Rodriguez,* 2015 CO 55, ¶ 13). We review steps one and two de novo. *Id.* But step three — whether the opponent of a strike has satisfied their burden of proving purposeful discrimination — is a question of fact that we review for clear error. *Id.*; *Owens,* ¶ 79. Under this standard, we reverse only "under 'exceptional circumstances,'" when the court's findings have no support in the record. *People v. Beauvais,* 2017 CO 34, ¶ 22 (quoting *Snyder v. Louisiana,* 552 U.S. 472, 477 (2008)); *see Wilson,* ¶ 13 (we give "great deference" to a court's step-three finding (quoting *Batson,*

8

476 U.S. at 98 n.21)).  If we conclude that a *Batson* violation

occurred, the remedy is automatic reversal.  *Wilson*, ¶ 80.

## 2. Additional Background

¶ 16   Rivers underwent several evaluations to determine his

competency to stand trial.  Although Rivers was found competent,

the resulting reports disclosed that Rivers had received disability

payments for post-traumatic stress disorder (PTSD).  Rivers sought

to endorse an expert on the effects of PTSD, and the prosecution

objected.  The district court ruled that Rivers' PTSD expert could

testify but that the prosecution would be permitted to provide

relevant rebuttal testimony.

¶ 17   During jury selection, several jurors expressed concerns

related to the financial hardship of serving on a jury.  Prospective

juror C.S. — an African American male and military veteran —

initially said he would be unable to afford taking time away from

work to serve on the jury, but he eventually confirmed that he

would be paid for his time and was able to serve.  The prosecutor

then asked C.S. a series of questions:

> PROSECUTOR: Let me, also, ask you, too,
> [C.S.] — and, again, I want to put this very
> delicately.  I know there are not a lot of jurors

9

of color in the room, not a lot of people of color. But I wanted to ask you very specifically, [C.S.], is there anything about what is going on nationally right now that we should know about as it might impact your ability to serve as a fair and impartial juror?

C.S.: No.

PROSECUTOR: Okay. And, look, man, this is — this is tough. I mean, you know the George Floyd trial is going on, right?

C.S.: Yeah.

PROSECUTOR: Okay. And do you have any strong opinions about the criminal justice system in light of it?

C.S.: I just hope that the justice system does the right thing.

. . . .

PROSECUTOR: Let me also ask, too, you know, especially because the defendant is a person of color as well as you are, sir. I'm not trying to single you out, I just want to make sure to ask. Is there any danger at all that there might be any bias or sympathy or prejudice, or would you make your decisions based on the evidence?

C.S.: Based on evidence, yes.

¶ 18     During questioning by defense counsel, C.S. volunteered that

he "suffer[s] from PTSD" after seeing "a lot of stuff in war." Defense

counsel explained that some of the evidence presented at trial could

10

be disturbing and asked C.S. whether that could "trigger" his PTSD. C.S. explained that he "[cannot] say because PTSD is just something that just happens. . . . [I]t's not controllable." The prosecutor did not ask C.S. any follow-up questions concerning his military experience or the effects of his PTSD.

¶ 19    At the end of voir dire, the district court asked the parties to approach to record their peremptory strikes, but the conference occurred without transcription by the court reporter, and there is no transcript of that part of the proceeding. However, in accordance with C.A.R. 10(e), the parties stipulated to the following:

- The prosecutor used a peremptory strike for C.S., and defense counsel immediately challenged the strike under *Batson.* Defense counsel argued that C.S. was one of the few African American jurors in the venire, that the prosecution had no valid reason to strike C.S., and that the strike was based on race and was therefore invalid.

- Before the court determined whether defense counsel made a prima facie showing of racial discrimination, the prosecutor explained that he was striking C.S. because "he had volunteered, in the course of defense questioning

11

during voir dire, that [PTSD] from prior military service might affect, or could 'trigger' him." The prosecutor noted C.S.'s statement that "his PTSD had a significant impact on him . . . [and] wasn't something he could control." The prosecutor was concerned that C.S.'s experience with PTSD "would influence his ability to fairly and impartially consider potential evidence from a defense expert" that Rivers' behavior following the murders may have been impacted by his PTSD.

- Defense counsel responded that C.S. had confirmed he could be fair and impartial and that the record did not establish that C.S.'s experience with PTSD would impact his ability to fairly consider the evidence.

- The parties engaged in a back-and-forth discussion, during which the prosecutor noted that there was another African American juror on the presumptive panel whom the prosecution did not intend to strike. That juror ultimately served on the jury.

- The court determined that the prosecutor's asserted justification for the peremptory challenge of C.S. was

credible and race neutral. Accordingly, the court overruled Rivers' *Batson* objection and excused C.S.

### 3. The District Court Did Not Err by Denying Rivers' *Batson* Challenge

¶ 20 Rivers contends that the prosecution's peremptory strike of C.S. was plainly motivated in substantial part by discriminatory intent and that his conviction must be reversed. He argues that C.S. "was an ideal juror for the prosecution" — he had a long and distinguished career in the military, he was "a rule-follower" committed to upholding the law, and in the face of the prosecutor's questions concerning social and racial justice issues, C.S. confirmed that he trusted the justice system to resolve any issues. Against this backdrop, Rivers contends there was no reasonable explanation for the prosecutor's strike of C.S. "other than the fact that he and . . . [Rivers] were both [B]lack and that the prosecution had concerns that this shared racial identity might somehow be problematic and potentially disqualifying."

¶ 21 Because only the third *Batson* step is before us, our review is for clear error. *Ojeda,* ¶ 30; *Owens,* ¶ 79. Thus, our only question is whether the record contains any support for the district court's

finding that the prosecutor's asserted justification for his peremptory challenge of C.S. was both race neutral and credible. *See Beauvais*, ¶ 22. We conclude it does.

¶ 22 During voir dire, C.S. volunteered that he served two tours in Iraq as a member of the military and that he "saw a lot of stuff in war" and "recovered a lot of bodies" while he was deployed. C.S. explained that, because of his military experience, he suffered from PTSD. While C.S. could not say whether the evidence submitted at trial would "trigger" his PTSD, he conceded that "it could" and that PTSD is "not controllable. It just happens." In light of Rivers' request to present expert testimony concerning how PTSD may have impacted his conduct, it was reasonable for the prosecutor to be concerned with how C.S.'s experience with PTSD might influence his ability to fairly and impartially consider the evidence.[3]

¶ 23 We are not persuaded otherwise by Rivers' counterpoints. First, Rivers argues that the prosecutor's concerns about C.S. were

---

[3] In a footnote, Rivers asserts that, "by this point, the prosecution had already made a tactical decision not to introduce evidence that would have opened the door to expert testimony that Mr. Rivers may have been suffering from PTSD . . . at the time of the incident," but he cites a trial transcript from eleven days *after* the prosecution struck C.S.

pretextual because the prosecutor made no effort to inquire into the potential impact of C.S.'s PTSD or military experience on his role as a juror. But the record shows that the prosecutor had no need to inquire further into C.S.'s experience because his responses to defense counsel's questions provided ample evidence to support the prosecution's asserted race-neutral basis for the peremptory strike.

¶ 24 To the extent Rivers argues that the prosecutor's justification for striking C.S. was "undercut[]" by his "strident defense of a juror, in response to a causal challenge by Mr. Rivers, who had issues very similar to Juror C.S.," the record belies this characterization of events. True, the other juror expressed concerns about the graphic nature of the evidence, calling back to decades of experience as an emergency room nurse and indicating that she did not "want to be unfair to anybody here." But she expressly denied having PTSD, which was the prosecutor's specific concern with C.S. Moreover, defense counsel moved to strike the other juror *for cause*. *See* § 16-10-103(1), C.R.S. 2025 (listing the grounds for a challenge for cause including, as the only ground possibly relevant here, "[t]he existence of a state of mind in the juror evincing enmity or bias toward the defendant or the state"). In response, the prosecutor

15

said striking the juror for cause was "a tough choice," reasoning that someone with the juror's experience could be a valuable and careful juror. That is hardly a "strident defense" of the juror. Ultimately, the court struck the juror for cause, not because of her emergency room experience or hesitancy to view the evidence, but because of a "prayer reference" — she said she had been praying all day not to be picked for the jury — and because she "would not know that she could be fair."

¶ 25    Second, Rivers argues that the only questions the prosecutor asked of C.S. centered on "issues of race" despite that topic having "absolutely nothing to do with" Rivers' trial. But the record does not reflect that C.S.'s responses to those questions played any part in the prosecutor's decision to excuse him from the jury. And the mere fact that the prosecutor did not ask similar questions of other prospective jurors does not neutralize the record evidence supporting the court's finding that Rivers failed to establish purposeful discrimination. *See Ojeda*, ¶ 27; *see also Owens*, ¶ 78 (identifying disparate questioning as one factor the court may consider in resolving the *Batson* challenge).

¶ 26    Third, Rivers contends that the prosecutor offered "post hoc justifications" for his strike of C.S. after the court had already denied the *Batson* challenge, which "smacks of a guilty conscience and was obviously a clumsy attempt to back-fill the record after consciously committing a constitutional crime." Frankly, we view the record differently.

¶ 27    Immediately before the court excused all remaining prospective jurors and announced the final jury, the prosecutor said,

> And, Your Honor, I just wanted to make one more note for the record. The defense had B[a]tson'd the People previously. We had absolutely left [juror B] on . . . this jury. She is a person of color, and [I] wanted the record to reflect that, because I've seen that appellate records sometimes in the aftermath can take issue with decisions the People made or did not make. We had never considered kicking [juror B] ever, and I wanted the record to reflect that.

It is not clear to us whether juror B served on the jury or was struck by defense counsel. Either way, we disagree that the prosecutor's statement was a post hoc justification for his peremptory strike of C.S. The prosecutor apparently felt the need to make a record about not striking all the people of color from the

17

jury, which certainly could have been relevant to the prior *Batson* challenge, but the prosecutor did not mention C.S. or give another, different reason for striking him.

¶ 28    Finally, we reject Rivers' contention that the court clearly erred because its "rationale for finding the prosecution's asserted justification for striking . . . C.S. credible isn't entirely clear." Typically, in the absence of a full transcript of the parties' conference — at which they discussed, and the court ruled on, their respective peremptory strikes — we would presume that the record supports the court's determination. *See People v. Gandiaga*, 70 P.3d 523, 527 (Colo. App. 2002) ("It is the appellant's duty to provide those portions of the record necessary to substantiate the claims of error on appeal.  Absent such a record, we must presume that the trial court's ruling was correct.").  Here, it appears that neither party is at fault for the absence of the relevant transcript, so we will not presume that the missing record provides greater clarity about the court's ruling.  But we also decline to employ the reverse presumption and assume that the court gave no explanation for its step-three finding.  The parties' stipulations provide us with enough of the court's rationale to evaluate its decision.

¶ 29    In the end, we are tasked with deciding whether this case presents the "exceptional circumstance[]" in which the district court's finding that the prosecutor's strike of C.S. was not motivated in substantial part by discriminatory intent has "no support in the record." *Beauvais*, ¶ 22 (citation omitted); *see Owens*, ¶ 78. It does not present such a circumstance. Consequently, we conclude that the district court did not err by denying Rivers' *Batson* challenge. *See Ojeda*, ¶ 30.

## B.    General Warrant

¶ 30    Rivers contends that the district court erred by denying his motion to suppress evidence obtained pursuant to a search warrant that lacked sufficient particularity. We disagree.

### 1.    Applicable Law and Standard of Review

¶ 31    The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV; Colo. Const. art. II, § 7. A search conducted pursuant to a warrant is typically reasonable. *People v. Coke*, 2020 CO 28, ¶ 34. But "so-called 'general warrants,' which permit 'a general, exploratory rummaging in a person's belongings,' are prohibited." *Id.* (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)). This prohibition

19

"safeguard[s] the privacy and security of individuals against arbitrary invasions by governmental officials." *Id.* at ¶ 33 (quoting *Carpenter v. United States*, 585 U.S. 296, 303 (2018)).

¶ 32　　To that end, the Fourth Amendment requires that search warrants include a "particular description" of the thing to be seized. *Andresen*, 427 U.S. at 480 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). And the Colorado Constitution requires the search warrant to describe the place to be searched or the thing to be seized "as near as may be." Colo. Const. art. II, § 7. To determine whether the particularity requirement is met, courts must "read warrants and the accompanying affidavits [together] in a practical, common sense fashion." *People v. Roccaforte*, 919 P.2d 799, 804 (Colo. 1996).

¶ 33　　A trial court's ruling on a motion to suppress presents a mixed question of fact and law. *People v. Morse*, 2023 COA 27, ¶ 17. We defer to the court's factual findings if they are supported by competent evidence in the record, but we review the court's legal conclusions de novo. *Id.* Evidence obtained pursuant to a search warrant that fails the particularity requirement should be suppressed. *See Roccaforte*, 919 P.2d at 802 ("The principal means

of effectuating the requirement is to suppress all evidence seized pursuant to an overbroad, general warrant.").

## 2. Additional Background

¶ 34 Before trial, a detective applied for a warrant to search the contents of the silver iPhone discovered near the crime scene about a week after the murders. The phone was found in a patch of grass by one of the victim's friends a few feet from where the victims' car had been parked. The application identified the iPhone as a silver iPhone 6, matching a description of a silver iPhone 6 owned by Rivers that he claimed had been stolen from him by Hazard. The detective believed that the device could contain material evidence related to the events on April 21.

¶ 35 The affidavit expressly incorporated two attachments. Attachment A was an affidavit from the detective, explaining in detail the crime under investigation, Rivers' alleged connection to the crime, facts leading the detective to believe that the iPhone belonged to Rivers, and "that a search of [the] phone would provide critical material evidence to [the] homicide investigation." Attachment B listed the information sought from the iPhone, which was expressly limited to information "believed to be relevant to the

21

[h]omicide incident on 4/21/2018."[4]  A magistrate reviewed and signed the application, authorizing the search warrant.

¶ 36     Following a search of the iPhone, Rivers filed a motion to suppress any evidence discovered from it, arguing that the warrant (1) "lacked particularity and effectively authorized the sort of general, exploratory rummaging condemned by our law" and (2) "failed to establish a nexus between the alleged criminal activity and the thing to be searched."  The prosecution responded that the search warrant described the property to be seized with particularity and sought specific categories of information that reasonably could be found on the iPhone and that related to "significant outstanding investigative questions."  In the alternative, the prosecution argued that the evidence should not be suppressed under the good faith exception to the exclusionary rule.

---

[4] We acknowledge that Attachment B to the search warrant requests three categories of information that are not limited by date or crime: (1) "[g]eneral photographs of the device"; (2) "[t]race evidence to include possible DNA and fingerprints"; and (3) "[s]pecific details of this particular device" including manufacturer and model.  But Rivers does not seem to challenge these categories, which are sufficiently particular without such limitations.

¶ 37   The district court held a suppression hearing, during which it heard testimony from the detectives involved in executing the search warrant and considered the parties' arguments. The detective who submitted the warrant application and supporting affidavit explained each of the categories of information in Attachment B and why investigators believed searching the iPhone for that information would lead to the discovery of material evidence related to the victims' murders. The detective also explained that he was careful to request evidence he believed to be relevant to the "homicide incident on 4/21/18" to clearly indicate that the "purpose of searching [the] phone was specifically to look for evidence pertaining to that homicide investigation."

¶ 38   In a written order, the court denied Rivers' motion to suppress. The court explained that, although the categories of information sought from the iPhone were comprehensive, "the items to be searched [were] limited by date and crime." The court concluded that the warrant was not the type of general warrant criticized in the case law cited by Rivers. The court also found that the investigator's "search was performed in objective reliance upon a validly signed warrant." Thus, even assuming the warrant was

overbroad, the court determined that "the good faith exception to a general warrant applies."

### 3. The District Court Did Not Err by Denying Rivers' Motion to Suppress

¶ 39 A warrant is generally required before a suspect's cell phone data can be searched. *People v. d'Estree*, 2024 COA 106, ¶ 38. Because cell phones have "immense storage capacities" and the "ability to collect and store many distinct types of data in one place," our supreme court has acknowledged that cell phones are "entitled to special protections from searches." *Coke*, ¶ 37. Accordingly, a warrant that authorizes "police to search a cell phone for all texts, videos, pictures, contact lists, phone records, and any data showing ownership or possession violates the particularity demanded by the Fourth Amendment." *People v. Thompson*, 2021 CO 15, ¶ 19. Still, "broad searches may be sustained against particularity challenges if they are constrained by certain limiting principles." *People v. Rodriguez-Ortiz*, 2025 COA 61, ¶ 27 (*cert. granted* Feb. 9, 2026). Specifically, warrants for the search of data on cell phones are sufficiently particularized if they include specific limitations based on (1) "the type of alleged criminal activity";

24

(2) "the identity of the alleged victim"; and (3) "the timeframe, if applicable, within which the suspected crime occurred." *People v. Stauch*, 2026 COA 22, ¶ 32; *see Coke*, ¶ 38.

¶ 40    In *Coke*, ¶ 35, law enforcement obtained a warrant to search the defendant's cell phone for all texts, videos, pictures, contact lists, and phone records, as well as any data showing ownership or possession. Because the warrant "contain[ed] no particularity as to the alleged victim or to the time period during which the assault allegedly occurred," the supreme court held that "such broad authorization violates the particularity demanded by the Fourth Amendment." *Id.* at ¶ 38. The court concluded that the warrant effectively "authorized a general search" of the defendant's phone and was unreasonable under the Fourth Amendment. *Id.*

¶ 41    Although Rivers cites *Coke*, he develops little argument that the search warrant was overbroad, baldly claiming it "was the epitome of a 'general warrant.'" Instead, he focuses on the lack of connection between himself and the iPhone that was searched. Specifically, he argues that "[t]he questionable provenance of the phone, coupled with the fact that there was actually very little evidence connecting the phone to Mr. Rivers, undermine both the

[district] court's conclusion that there was sufficient evidence to justify the warrant, as well as its determination that the warrant was narrowly tailored." Critically though, Rivers' contention disregards the level of detail in the warrant and its attachments.

¶ 42 Attachment A, which was expressly incorporated into the warrant by reference and signed by the issuing magistrate, clearly identified the victims and explained in detail the circumstances of the crime. *See Stauch*, ¶ 27 (search warrants for cell phone data are sufficiently particularized if they identify the alleged criminal activity and the victims that were harmed). It also offered detailed facts supporting the detective's belief that the iPhone belonged to Rivers and would contain material evidence of the crime. For example, Attachment A provided that (1) Rivers' mother told police that Rivers had two phones: "a grey iPhone and . . . a flip style phone"; (2) detectives discovered the flip phone at Rivers' residence, but not the iPhone; (3) Rivers claimed that Hazard took his iPhone from him on the day of the crimes, but he did not know where the iPhone ended up; (4) Hazard's friend said he saw Hazard with a damaged silver or grey iPhone 6 the day of the murders; and (5) the

26

iPhone was discovered in a patch of grass just feet away from where the victims' car had been parked.

¶ 43    Further, Attachment B, which was expressly incorporated into the warrant by reference, detailed the iPhone to be searched and the categories of data to be collected.  The warrant restricted the investigators to collecting only data "believed to be relevant to the Homicide incident on 4/21/18."  *See id.* (search warrants for cell phone data are sufficiently particularized if they identify the timeframe within which the suspected crime occurred).

¶ 44    Taken together, the search warrant and its attachments included specific limitations as to the crime under investigation, the date upon which the crime occurred, and the identities of the victims involved, and it authorized a search for data related to only those specifics.  *See id.*  The search warrant did not permit a general rummaging of the iPhone but instead targeted information related to Rivers' involvement with the victims' murders.  Thus, the search warrant satisfied the Fourth Amendment's particularity

requirement, and we discern no error in the district court's denial of the motion to suppress.[5]  *See id.* at ¶ 41.

## C.    Felony Murder Convictions

¶ 45    Rivers was charged with and convicted of two counts of first degree murder (after deliberation) (counts one and seventeen) and two counts of felony murder based on the predicate offenses of "arson and/or robbery" (counts seven and twenty-three).  Charges one and seven related to victim Garcia, and charges seventeen and twenty-three related to victim Denton.  The district court entered convictions and sentenced Rivers on all four murder counts.

¶ 46    Rivers contends that his felony murder convictions rest on insufficient evidence that he caused the victims' deaths in the course of or in furtherance of the predicate offense of arson.  *See* § 18-3-102(1)(b), C.R.S. 2018.  Although the People disagree and alternatively argue that Rivers' felony murder convictions were also predicated on robbery, they concede that the felony murder

---

[5] In light of our disposition, we need not reach the People's alternative argument, not raised in the district court, that Rivers lacked standing to assert a Fourth Amendment violation because he was not entitled to a reasonable expectation of privacy in a phone that he abandoned at a crime scene.

28

convictions must be vacated because the district court violated Rivers' double jeopardy rights by entering separate convictions for first degree murder (after deliberation) and felony murder for each victim. *See People v. Wood,* 2019 CO 7, ¶ 27 (a defendant may not stand convicted of both first degree murder (after deliberation) and felony murder for the killing of a single victim).

¶ 47     Nonetheless, Rivers urges us to address his sufficiency argument, arguing that the proper remedy for the admitted double jeopardy defect is to merge the felony murder convictions into the first degree murder (after deliberation) convictions, rather than to vacate the felony murder convictions, which would allow him to challenge both convictions on appeal.[6]  *See Candelaria v. People,* 148 P.3d 178, 183-84 (Colo. 2006) (because the defendant was convicted of both deliberate murder and extreme indifference murder for killing the same victim, the division ordered that the convictions be merged into "a single, generic judgment of conviction

---

[6] We note that Rivers did not challenge the sufficiency of the evidence supporting his convictions for first degree murder (after deliberation).

29

for first degree murder"). But Rivers attempts to draw a distinction without a difference.

¶ 48 When a defendant is convicted of both first degree murder (after deliberation) and felony murder based on the killing of the same victim, merging the felony murder conviction into the first degree murder (after deliberation) conviction has the same effect as vacating the felony murder conviction. *Wood*, ¶ 29 (merger has the same effect as vacating one of the multiplicitous murder convictions); *accord People v. Rhea*, 2014 COA 60, ¶ 17. Even so, our supreme court has clarified that, where multiplicitous convictions exist, the appropriate remedy is "to vacate . . . the underlying [conviction] as well as the . . . sentence based upon it." *Wood*, ¶ 28 (quoting *United States v. Barrett*, 496 F.3d 1079, 1095 (10th Cir. 2007)).

¶ 49 Because Rivers was convicted of both first degree murder (after deliberation) and felony murder for killing the same two victims, his convictions and sentences for felony murder must be vacated. *Id.* And because we conclude that the felony murder convictions must be vacated, his contention that the evidence was

insufficient to sustain those convictions is moot. *See People v. Fuentes*, 258 P.3d 320, 326 (Colo. App. 2011).

### III.  Disposition

¶ 50  We vacate Rivers' convictions and sentences for felony murder (counts seven and twenty-three) and remand this matter to the district court with instructions to correct the mittimus accordingly. We otherwise affirm the judgment of conviction.

JUDGE HARRIS and JUDGE TOW concur.